ISADORE R. HOPPE and others *vs.* ELIZA ANN BYERS, and JOHN G. BYERS, her husband.

*Contested will—Forgery vel non—Admissibility of declarations of the Deceased as Corroborative Evidence—Time allowed for Appeal on trial of Issues from Orphans' Courts.*

A certain paper-writing, unattested, purporting to be a will of personal property, was alleged to be a forgery, and the issue of forgery *vel non*, was transmitted for trial to a Court of law. HELD:

That after the introduction of direct proof of the genuineness of the hand-writing, met by direct proof to the contrary, declarations of the deceased, corroborative of such direct proof, were admissible in evidence for either party.

An appeal from rulings of a Court of law upon the trial of issues sent from the Orphans' Court, is not an appeal from an order or decree of an Orphans' Court, but from a " determination of a Court of law," from which an appeal may be taken within nine months from its date, and the record transmitted within six months after the appeal, as provided by Rule 2, (29 *Md.*, 1.)

APPEAL from the Circuit Court for Washington County.

The case is stated in the opinion of the Court.

The cause was argued before MILLER, YELLOTT, ROBINSON, and IRVING, J.

*Charles B. Roberts,* and *Charles Marshall,* for the appellants.

*L. E. McComas, Alexander Neill,* and *William P. Maulsby,* for the appellees.

MILLER, J., delivered the opinion of the Court.

The single issue transmitted for trial in this case was whether a certain paper-writing propounded for probate on the 19th of September, 1881, by Eliza Ann Byers, wife of John G. Byers, as the will or testament of John Henry Hoppe, was written or signed by him, or signed by some other person in his presence or by his express direction?

Mr. Hoppe died in January, 1881, at the age of eighty-one years, leaving personal estate valued at about $127,000, and real estate worth about $38,000. He left a widow and six grandchildren, children of a deceased son who had died in December, 1877, his sole heirs-at-law. It also appears from the record that Eliza Ann Byers, whose maiden name was Geatty, had lived with Mr. Hoppe in his family from early childhood until her marriage in 1853. In January, 1875, she and her husband resided near Littlestown, Penn., about fourteen miles from Westminster, where Mr. Hoppe lived, and on the 9th of that month he wrote a letter on one side of a half sheet of foolscap paper which was enclosed in an envelope addressed to John G. Byers, and was put in the post-office on the 11th of the same month. That letter is as follows:

"WESTMINSTER, Jan'y 9th, 1875.

"This is to inform you and your wife that John T. Diffenbaugh called on me and stated that your wife, Eliza Ann Byers *is* coming to her out of the estate of Anna Geatty, deceased, according to the first and final account thereof, settled by Andrew Reese Durbin, deceased, executor of said Anna Geatty, in the Orphans' Court of Carroll County, Feb'y 10th, 1873, amount due Eliza Ann Byers, wife of John Byers, the sum of $31.30. John T. Diffenbaugh, as executor of Andrew Reese Durbin, is about making settlement in the Orphans' Court, of Durbin's estate, of the funds in his hands to be distributed among the creditors of said deceased. I have pose-d a notice as you will see and read,

as given in the newspapers in our town ; you will give this notice your and your wife's attention, for the purpose of getting your dividend, and I now propose to you, and your wife, to meet me in Taneytown, on Wednesday, the 13th of January, 1875, at the Hotel of Elliott, in Taneytown, at 10 o'clock, A. M. On which day I have a sale to cry for Isaac E. Pearson, trustee of David Sentz' property. I have prepared your claim for you to *sware* before me as Justice of the Peace, and when done, I will file your claim with the Registor of the Orphans' Court, so you may get your dividend out of the estate of Durbin. By attending to this, will save you trouble and expence ; I hope to see you at Taneytown on the day above named ; we are all reasonably well ; hoping these may find you all well,

"Yours in haste, respectfully,

J. HENRY HOPPE.

"John G. Byers and Eliza Ann Byers."

This letter is admitted to be in the hand-writing of Hoppe. At the bottom of the page and at the corner are the words "Turn over," and then on the reverse or opposite side of the same half sheet, is found the alleged testamentary writing as follows :

"Ann, don't worry yourself about this matter, as you see you are almost cut out on every side by your father and your mother, but you have been a faithful daughter to me, and have obeyed me, and you have seen a great deal of trouble ; don't worry yourself, but take things easy, and do the best you can for the present. I have prospered, and have accumulated a great —— of money together, and I intend to do what I please with it. And, Ann, after my death you are to have forty thousand dollars ; this you are to have, will or no will ; take care of this letter until my death. Ann, keep this to yourself.

" J. HENRY HOPPE.

"To Eliza Ann Byers."

The caveators, who are the widow, heirs-at-law, and administrators of Hoppe, insisted that all this writing, including the words "Turn over" on the first page of the letter, was an out and out forgery. At the trial of this one issue of forgery *vel non* the jury found a verdict for the caveatees, Byers and wife. In the course of the trial a single exception was taken by the caveators, and as counsel do not agree as to the question raised and presented for review by this exception, it becomes necessary to state it somewhat at length.

It appears then that the caveatees first offered in evidence the disputed instrument, and proved by a competent witness *that the same was in the hand-writing of Hoppe.* The caveators then proved by Dr. Herring *that neither the paper nor the signature to it was in Hoppe's hand-writing.* They then offered to prove by the same witness that in October, 1880, Hoppe said he would have to make a will, and was examining his papers with that view; that about two weeks before his death he sent for witness and said he was about to make his will and wanted Parke to write it when he got it arranged in his mind, and that he wanted witness and Longwell to be his executors. The caveatees objected to the admissibility of these declarations, when the Court suggested that the question be reserved until it should appear whether any further, and if so, what declarations of the deceased would be offered on each side, when argument on the question of their admissibility would be heard, and the Court would indicate its opinion, and any declarations on either side might be introduced in conformity therewith. In the further progress of the case and after the caveators had given testimony *by other witnesses to prove that this paper was not in the hand-writing of Hoppe, and was not signed by him,* they offered to give in evidence other declarations of Hoppe, but the caveatees again objected. The Court then requested counsel on either side to put in writing the declara-

tions they proposed to offer, and announced that it would then give its opinion on the general question of the admissibility of such declarations. Thereupon, and in compliance with this suggestion, counsel for the caveators submitted a written statement showing that they proposed to prove the following declarations, all made since January, 1875, the date of the paper in dispute.

1st. By Dr. Herring, that a short time before his death, Hoppe stated to witness that he had not made any disposition of his property, but intended to make his will, and for that purpose had spoken to Mr. Parke, an attorney, to prepare a draft of his will, and that he had selected his executors.

2nd. By Parke, that a short time before his death, Hoppe requested witness to prepare his will, and for that purpose stated to him the particular disposition he intended to make of his property, and that witness took down in writing the names of the beneficiaries, and the amounts stated to him by Hoppe ; that these memoranda in writing were made by witness in the presence of Hoppe, and were, by witness, read over to him, and he said the same were correct; that subsequently witness had a conversation with Hoppe, who again stated what disposition he proposed to make of his property, and that on neither occasion, nor at any other time, did he mention the name of Eliza Ann Byers as one of the beneficiaries under his will; that by these instructions, he gave small sums to nearly all of his relations, and left the balance of his property to his widow and grandchildren.

3rd. By various witnesses, that Hoppe stated, after the death of his son, he intended to leave his whole estate to his wife and grandchildren ; that he frequently said, "who but my wife and grandchildren should inherit my property ?" and that when his widow got her share, each of his grandchildren would have about $25,000 ; and further to prove that this estimate would absorb the whole estate.

4th. By Mrs. Hoppe, the widow, that her husband told her a few days before his death, that he had made no disposition of his property, and that the law made for him the only will he wished; that she would get a good part of his property, and the balance would go to his grandchildren.

Counsel for the caveatees also submitted a written statement, by which they offered to prove:

1st. That just prior to the marriage of Eliza Ann, in 1853, Hoppe, whilst speaking of objections made by her father, Geatty, to her marriage, said she was *his* daughter, and he was able and would provide for her well, and that he did not care whether Geatty did anything for her or not.

2nd. That in 1860, after her marriage, he expressed his strong affection for her, recapitulated her filial devotion and services to him, and that he intended to give her a child's share of his estate.

3rd. That prior to the death of his son, he frequently complained of his son's wastefulness and want of economy, and also that of his son's wife and children, and said they should not spend all the money he had saved; that he would give a child's share of his estate to Eliza Ann.

4th. Various other declarations made by him at various times, to the same substance and effect.

5th. That after the death of his son, he declared his son's children should not spend all his money after his death, in driving about in carriages; and that he had secured to Eliza Ann a share of his estate.

6th. That he declared he intended to give Eliza Ann a child's share of his estate, which would be about $40,000, and that after the death of his son, he said to the same witness, that now he had done what he had said to witness he would do.

7th. That in 1880, he said he had secured a child's share, or a share of his estate, to Eliza Ann Byers.

Thereupon, after hearing argument, a majority of the Judges before whom the case was tried, announced the opinion of the Court to be that any declarations of Hoppe would be admissible, provided their character and nature were such as might throw light on the matter of probability, whether he had or had not written and signed the paper in question, and that counsel might proceed under this view, and as the case progressed the Court would apply this view of the law to the particular declarations which might be offered on both sides. "And it was thereupon *understood and agreed,* upon both sides, that all such testimony be taken subject to exception, and *exceptions were to be understood as reserved* to all such proof of declarations by both sides."

The caveators then gave in evidence by several witnesses, declarations of the deceased substantially such as were stated in their written offer, and closed the case on their side. The caveatees then offered proof by other *witnesses, tending to show that the paper, as well as the signature thereto, was in the hand-writing of the deceased.* They then proved, by a number of witnesses, (whose testimony is set out in the exception,) declarations of the deceased such as were stated in their written offer. "Thereupon the caveators, under the *understanding* and *agreement* hereinbefore mentioned, objected to the admissibility of all and each and every of the declarations of the said John Henry Hoppe hereinbefore set out as given in evidence by the caveatees, but the Court overruled said exceptions and admitted said declarations, to which ruling of the Court the caveators excepted."

From all this, it seems to us plain that it was the intention of the Court, as well as of counsel on both sides, that the declarations referred to should be admitted subject to exception, and that either party should have the right, after they had been proved, to except to the admissibility of each and all of such declarations offered by the other,

so that the question of their admissibility might be brought up for review. This, in our opinion, is the true and proper construction of the exception, and it follows that the question before us is, was there error in admitting any or all of the declarations offered and proved on the part of the caveatees?

The question, as thus presented, is a new one in this State. In the case of *Collins vs. Elliott,* 1 *H. & J.,* 1, all the attesting witnesses to the will were dead, and the declarations of the testator that he had made a will, and of the attesting witnesses that they had witnessed a will made by him, were offered in evidence by the party claiming title under the will, but the Court held that such declarations could "not be received to *establish the will,*" and that "proof of the hand-writing of the testator and of all the witnesses was necessary" in order to let in the will as passing title to the land in controversy. In a subsequent ejectment for the same land, it appeared that two of the deceased witnesses were marksmen, and it was held that where witnesses have put their marks there must be proof that such marks are the marks of the witnesses. *Collins and Wife vs. Nicols and Wife,* 1 *H. & J.,* 399. In *Massey vs. Massey,* 4 *H. & J.,* 145, it was decided that the declarations of a testator to the effect that he believed he had destroyed his will, were not admissible for the purpose of proving a revocation. As to these propositions there can be no question. Neither the execution nor the revocation of a will can be proved by the mere parol declarations of the alleged testator that he had made, or destroyed it, for that would be in direct conflict with the requirements of the statute on these subjects. Many of the authorities cited in argument go no further than this, and it is not necessary to notice them more particularly, as they have little or no bearing upon the question before us.

In the case of *Griffith vs. Diffenderffer, et al.,* 50 *Md.,* 467, the question arose how far and for what purpose

such declarations were admissible under issues involving undue influence and fraud, and the Court approved the doctrine which seems to be established by the current of modern decisions in this country, that declarations of a testator made after the execution of the will, and so remote as not to constitute part of the *res gestæ* cannot be offered as independent evidence to prove the charge of fraud, or to show the *external acts* of undue influence or attempts to influence him to make a will in a particular direction, but are admissible to prove his mental condition and place him before the jury just as he was when the will was made, so that they could judge whether he had intelligence enough to detect the fraud, and strength of will enough to resist the influences brought to bear upon him, provided such declarations were made sufficiently near in time to justify a reasonable inference, that the mental condition they are intended to indicate existed when the will was executed. In answer to the objection that such evidence may have an effect beyond that for which it can be legitimately offered, and though not competent to prove the *facts*, upon which the charges of fraud and undue influence are founded, they may nevertheless tend to bias or prejudice the jury, the Court say, the same objection is applied also to other species of evidence which is competent for one purpose and not for another, and if it be admissible under the general rules of evidence it cannot be excluded on that ground. Applying this general doctrine to the case before them, the Court held that declarations of the testatrix, made nearly a year *after* the date of the will, to the effect that she was dissatisfied with it, that she had been persuaded to make it, that she was sorry she had not let the law make a will for her so that her children would have fared alike, that she had done great injustice to her other children and grandchildren, that she was troubled about it and was sometimes tempted to destroy the will, and other like declarations, were ad-

missible for the purpose of proving her *mental condition* at the time of the execution of the will but *for no other purpose.* This is a conclusive adjudication that such *subsequent* declarations, subject to the restriction, and to the extent and for the purpose thus indicated, are admissible under issues involving fraud and undue influence as well as testamentary capacity. In the same case declarations of the testatrix in regard to her testamentary intentions, made some months *before* the will and before any improper influences are supposed to have operated upon her, were also held to be admissible. "Evidence of this character," say the Court, "may be offered either to rebut the charges of fraud and undue influence by showing that the will is consistent with the long cherished wishes of a testator, or that it is contrary to well settled convictions of what he thought was a just and proper disposition of his property among others standing in the same natural relation with those benefited by the will. The weight to be given to such testimony is a question for the jury."

But the questions thus decided are not exactly the same as that now before us. In that case (as indeed in most instances where there have been charges of fraud and undue influence) the genuineness of the instruments and of the decedent's signature thereto were admitted. The question whether, or to what extent such declarations are admissible upon a charge of *forgery* did not arise, and, in fact, we have found but very few cases in which such a question has arisen upon the single issue of *forgery vel non.* The only reported English case, brought to our notice by counsel, in which the question has been decided, is that of *Doe ex dem. Ellis vs. Hardy*, 1 *Moo. & Rob.*, 525. It was an action of ejectment. The lessor of the plaintiff claimed title under a codicil to a will, and the defence was that the alleged codicil was a forgery. The plaintiff, after giving other evidence, which was admitted without objection, offered declarations of the testator of his intention that the

lessor of the plaintiff should have the property. They were objected to by the defendant, but LITTLEDALE, J., before whom the case was tried, overruled the objection and admitted them, saying, "I think the declarations of the testator are admissible to show his *intentions* where the defence is either fraud, circumvention or *forgery.*" It is true this was simply a decision at a *nisi prius* trial, but, though made as long ago as 1836, it does not appear to have been overruled or questioned by any subsequent English authority. On the contrary the very language of the Judge has been cited and adopted by the most eminent English text-writers on evidence and wills. 2 *Taylor on Ev., sec.*, 1038; *Roscoe's Nisi Prius Ev.*, (14*th Ed.*,) 57 *and* 971; 1 *Jarman on Wills*, (5*th Amer. Ed. from* 4*th Eng. Ed.*,) 723. See also 1 *Redfield on Wills*, (4*th Ed.*,) 511, *note* 4.

But apart from direct authority on the subject, if declarations of a deceased party are admissible in any case, or to any extent, or for any purpose, where the validity of an instrument set up as his will, is in controversy, why should they not be admitted in a case like the present? This paper, if it be testamentary in its character, (a question not now to be decided,) can be effective only as a will of personalty. It does not profess to pass real estate and was not attested by witnesses. There was no witness who could prove that he saw the deceased write or sign it. Proof as to his hand-writing by witnesses acquainted with it, was the only *direct* testimony by which the genuineness of the instrument could be established or assailed. Such testimony was offered, and we infer from the record, that a large number of witnesses, and perhaps an equal number on each side, testified upon this subject, those for the caveators swearing that to the best of their knowledge and belief the writing was not, and those for the caveatees that it was, the hand-writing of the decedent. The jury had also before them on the same paper the admittedly

genuine part of the letter and were at liberty to compare this with the disputed writing. But in this state of case was no other evidence admissible? Were the jury bound to decide the issue and make up their verdict upon such testimony alone, and do the rules of evidence inexorably exclude from their consideration every other fact or circumstance that would tend to throw light upon the subject, so as to render it probable or improbable that such a paper was ever written by the deceased, or in corroboration of the direct testimony as to hand-writing given on either side? We think not. It must be admitted that testimony as to hand-writing, in any case of alleged forgery, though the best the nature of the case admits of, is usually the most unsatisfactory species of evidence Courts of justice have to deal with. It is matter of common experience in such cases that witnesses of equal honesty and character, and with equal means of knowledge, are found to testify both for and against the genuineness of the disputed signature. The difficulty and doubt are increased in a case like the present, where the instrument alleged to be forged is set up as a will which takes effect only after death, and where a forgery, if committed, would surely, if ever, come to the knowledge of the party whose testament it purports or is said to be. It seems to us that in such a case every collateral fact and circumstance which is not clearly immaterial and irrelevant ought to be admitted, to aid the jury in reaching the *truth*, which after all is the object of every jury trial.

The relation which Mrs. Byers had occupied to the deceased, the feelings, whether friendly or otherwise, which, during his life, he manifested towards her, are facts which are certainly not immaterial or wholly irrelevant, and where such feelings have been manifested, as they usually are, by declarations made to intimate and confidential friends who are clear and positive in their statements of them, and especially when made under such circumstances

Hoppe, *et al. vs.* Byers.

as to show that they were earnest and sincere, we see no good reason why they should be excluded from the consideration of the jury. So again, and upon the same ground, his declarations made before the date of the disputed paper, to the effect that he intended to give her a share of his estate, followed by declarations made after that date to the effect that he had done what he had said he would do, and had secured to her, or given to her, a share of his estate, were, in our opinion, *admissible* in evidence. In such case the *time* when the declarations were made is of less importance than in cases where *mental condition*, at a particular period, is sought to be shown. Of course more or less *weight* is attributable to them according as they were more or less remote from the date of the disputed writing, but their *admissibility* is not affected thereby. Entertaining this view of the law on the subject, we have carefully examined the declarations testified to by the several witnesses on the part of the caveators, and are of opinion they were each and all admissible. In this connection it is proper also to say that if the question were before us we should entertain no doubt as to the admissibility of the declarations offered on the part of the caveators, testified to by their witnesses as made after the date of the alleged testamentary paper.

But in thus sustaining the ruling excepted to, it must be distinctly understood that we hold that such declarations would not be admissible if they stood alone, and had not been *preceded* by the direct proof of witnesses as to the genuineness of the hand-writing. They are not to be taken as direct proof to establish the paper, but merely as corroborative of such direct proof, or as a circumstance in a case of this character, where such direct evidence had been first given, proper for the consideration of the jury. Besides the English authorities referred to, we think the admission of such testimony under such circumstances, and for such purpose, is sustained by the majority of American

cases, few as they are, in which this question has directly arisen, been considered and expressly decided. *Turner vs. Hand*, 3 *Wallace, Jr.*, 92; *Taylor Will Case*, 10 *Abbott's Pr. Rep.*, 300; *Johnson vs. Brown*, 51 *Texas Rep.*, 65; *Beadles vs. Alexander*, 9 *Baxter, Tenn. Rep.*, 604.

Since the above was written our attention has been called to two recent English decisions which were not cited in argument. The first is *Sugden vs. Lord St. Leonard, Law Rep.*, 1 *Prob. Div.*, 154, in which it was decided that declarations, written or oral, made by a testator both before and after the execution of his will, are, in the event of its loss, admissible as secondary evidence of its contents. The other is *Gould vs. Lakes, Law Rep.*, 6 *Prob. Div.*, 1, where it was held that statements of a testatrix, whether made before or after the execution of the will, are admissible to show what papers constitute the will; and in delivering the judgment of the Court in that case, the President (Sir JAMES HANNEN) said: "In considering whether or no several pieces of paper constitute the will, evidence would be admissible to show that it was the intention of the testator to make dispositions in conformity with those found upon the several sheets of paper. The present question is whether these two papers were joined together, or were before the testatrix at the time she signed. But the question of law would not be different if the suggestion were that the first sheet was a forgery or an interpolation by somebody after the event. In such a case could it be said that in order to establish that this sheet was a genuine part of the will, evidence could not be given of a statement of the testatrix before she made the will, that she was going to dispose of her property in the manner in which it appears to be left in the paper alleged to have been interpolated? And in my opinion it is also the law that statements to the same effect subsequent to the making of the will would also be admissible to show what was the state of the testatrix's

mind and intention, just as it would be an ingredient in the consideration whether or no a supposed interpolated sheet were a part of the will at the time of the execution." From this it would seem to be clear that the English Judges of the present time would have no difficulty in holding the declarations of the decedent offered in evidence in this case, admissible.

The motion to dismiss is overruled. This is not an appeal from an order or decree of an Orphans' Court, which must be taken within thirty days from the date of the order, and the record transmitted within thirty days from the date of the appeal, as required by Rule 13, (29 *Md.*, 6,) but is an appeal from a "determination of a Court of law," from which an appeal may be taken within nine months from its date, and the record transmitted within six months after the appeal, as provided by Rule 2, (29 *Md.*, 1.) Appeals from rulings of a Court of law on a trial of issues sent from an Orphans' Court have always been treated as falling under the last cited Rule, and under that the appeal and transmission of the record in this case were in time.

*Ruling affirmed, and*
*cause remanded.*

(Decided 20th June, 1883.)